## THE PILOT.

### UNITED STATES *v.* THE STEAM TUG PILOT.

*(Circuit Court of Appeals, Ninth Circuit. April 19, 1892.)*

**FOREIGN WATERS—TOWAGE BY FOREIGN TUGBOATS.**
The treaty between the United States and Great Britain of June 15, 1846, fixes the boundary between the two countries in the straits of San Juan de Fuca by a line following the middle of the strait, but also secures to each nation a right of free navigation over all the waters of the strait. *Held,* that all the waters north of the boundary line are "foreign waters," within the meaning of Rev. St. § 4370, which excepts from the penalty therein imposed against foreign tugboats towing vessels of the United States, cases where the towing is, in whole or in part, within or upon foreign waters. 48 Fed. Rep. 319, reversed.

*(Syllabus by the Court.)*

Appeal from the District Court of the United States for the District of Washington, Northern Division.

Libel by the United States against the British tug Pilot for violation of section 4370, Rev. St.· Decree for libelant for $643 and costs. 48 Fed. Rep. 319. The owner appeals. Reversed.

Burke,. Shepard & Woods, (Thos. R. Shepard, of counsel,) for appellant.

P. H. Winston, for appellee.

Before GILBERT, Circuit Judge, and DEADY and HAWLEY, District Judges.

GILBERT, Circuit Judge. On the 2d day of May, 1891, the British tug Pilot spoke the American bark Valley Forge in the straits of San Juan de Fuca at a point about ten miles from the entrance of the straits, and three miles off Port Vancouver, in the province of British Columbia. The bark was an enrolled vessel, engaged in coastwise trade,·and was proceeding on her voyage from San Francisco to Port Angeles. A contract was made between the captains of the two vessels, by which it was agreed that the tug should tow the bark to Port Angeles, where the bark would exchange her certificate of enrollment for a register to entitle her to clear for a foreign port, and then should tow her to Departure bay, a British port, thence back, through the straits, to the sea. After picking up the bark, the tug towed her along the Vancouver shore, a distance of 38 or 40 miles, and thence across the straits to Port Angeles. The greater part of the towing was upon waters north of the middle line of the channel which separates the state of Washington from Vancouver's island. The bark lay at Port Angeles until the 6th day of May, when the tug was libeled by the United States for violation of section 4370 of the Revised Statutes. That section contains the act of July 18, 1866, entitled "An act to prevent smuggling and for other purposes," and the amendment to the same by the act of February 25, 1867. It reads as follows:

"Sec. 4370. All steam tugboats not of the United States, found employed in towing documented vessels of the United States plying from one port or place in the same to another, shall be liable to a penalty of fifty cents per ton on the measurement of every such vessel so towed by them, respectively, which sum may be recovered by way of libel or suit. This section shall not apply to any case where the towing, in whole or in part, is within or upon foreign waters.".

The question is presented whether the waters of the straits of San Juan de Fuca, lying north of the dividing line between the United States and British Columbia, are "foreign waters," within the meaning of the statute. By the treaty between the United States and Great Britain of June 15, 1846, the boundary line between the possessions of the two nations is made to run through the middle of the straits. By the same treaty, however, it is stipulated that the entire straits shall be open and free to both countries for the purposes of navigation, so that the vessels of each may sail anywhere upon either side of the line; and under this provision it is contended that the waters north of the line cannot be considered foreign waters, but that all the waters of the straits are common to both nations. We do not so construe the effect of the treaty. Notwithstanding the license of free navigation over the whole of the straits, which is

reserved to each of the contracting parties, a definite line of division is adopted, which determines the limit of jurisdiction of each nation. All waters north of the line are British waters, subject to the control and dominion of Great Britain. All waters south of the line are American waters, and are under the jurisdiction of the United States. The privilege of free navigation exercised by each nation of the waters of the other is in the nature of an easement, which in no way affects the question of the jurisdiction. The decree of the district court which is appealed from is itself a declaration of the doctrine of the exclusive jurisdiction of each nation over its own half of the waters of the straits; otherwise it is not perceived that a British tug could, for an act committed upon the American side of the line, be made subject to a penalty imposed by the laws of the United States. The word "foreign" means belonging to another nation or country; belonging to or subject to another jurisdiction. The waters of the straits north of the boundary line belong to and are subject to the jurisdiction of Great Britain, and hence are foreign waters. The United States, although having a right of free navigation, has no jurisdiction over them, except so far as regards its own citizens. The case of *The Apollon*, 9 Wheat. 362, is relied upon by the appellee as supporting the doctrine that no part of the waters of the straits can be considered foreign to either British or American vessels. The question which arose in that case was whether a French vessel, which had entered and anchored in the St. Mary's river, and then proceeded out to sea and to a Spanish port, had entered American waters, so as to be required to make entry at the customhouse of that district, under section 29 of the collections act of 1799. The St. Mary's river being the boundary between the United States and the Spanish possessions, upon the general principles of the law of nations its waters were common to both nations for the purposes of navigation. The court, without deciding whether any of the waters of the river were American waters, held that the true exposition of the twenty-ninth section was that it meant to compel an entry at the customhouse of all vessels coming into our waters, being bound to our ports, and that the Appollon had not entered American waters, within the meaning of that statute. It is proper to note that the evident object of the amendment contained in section 4370 of the statute is in harmony with the construction which we have adopted. The law, as originally enacted, did not embody the exception in regard to towage, in whole or in part, upon foreign waters. Upon the petition of "owners of tugs and vessels on the lakes and rivers of the northern frontier," the amendment of February 25, 1867, was made. Its purpose was to avoid the difficulty and inconvenience which attended the application of the statute upon the lakes of the northern frontier, where, as in the straits of San Juan de Fuca, the boundary line is a fixed line, but in practical navigation its position upon the waters would always be difficult to locate with certainty. The decree is reversed, and the case is remanded, with instructions to dismiss the libel, and to enter a decree for claimant.